**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Donald O. Black, | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| Cornerstone Television Inc., | |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff Donald O. Black ("Mr. Black") submits this Verified Complaint against Defendant Cornerstone Television Inc. d/b/a Cornerstone Television Network ("CTVN") and avers as follows:

1.    This action seeks to remedy, *inter alia*, CTVN's wrongful termination of Mr. Black's employment and resultant unlawful breach of contract, CTVN's unfortunate and egregious defamatory statements associated with such wrongful termination of Mr. Black's employment, false public statements related thereto and CTVN's conversion of intellectual property rightfully owned by, and monies properly payable to, Mr. Black.

2.    This action arises under, *inter alia*, the Declaratory Judgment Act, 28, U.S.C. § 2201, the Copyright Act, 17 U.S.C. § 101 *et seq.*, the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.* and Pennsylvania common law for wrongful termination, defamation and slander.

1

## THE PARTIES

3.      Mr. Black is an adult individual domiciled in the Commonwealth of Pennsylvania and is the former Chief Executive Officer and President of CTVN.

4.      CTVN is a Christian broadcast and satellite television network nonprofit corporation with its principal place of business at 1 Signal Hill Drive, Wall, Pennsylvania 15148-1499.

## JURISDICTION AND VENUE

5.      This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the action is brought, in part, under the Declaratory Judgment Act and the Copyright Act and the conduct alleged herein relates to physical and electronic materials distributed in, and intended for distribution in, interstate commerce.

6.      This Court has personal jurisdiction over CTVN because it is a Pennsylvania corporation and because it conducts business in Pennsylvania, both specifically in connection with the conduct at issue in this action and generally through systematic and continuous minimum contacts with Pennsylvania.

7.      Venue is proper in this district under 28 U.S.C. § 1391 because Mr. Black is located in this district, CTVN is subject to personal jurisdiction in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### *Background*

8.      Mr. Black has dedicated his life to serving the Christian community.

2

9.     Mr. Black earned his master's degree in Communication from Regent University and attended the Regent University School of Law.

10.     Mr. Black has successfully served in executive leadership on several nonprofit teams with very strategic worldwide missions.

11.     Mr. Black has developed and led large teams of highly skilled professionals who have worked together to accomplish their organization's goals and further their mission with excellence and integrity.

12.     Mr. Black has dedicated his thirty-four year career to Christian faith and family based missions with his strategic, servant based leadership skill sets.

13.     Mr. Black is a compassionate leader. He is motivated to help people grow and develop their knowledge, talents and skills in order to improve their careers and lives.

14.     Mr. Black is a loving husband to his wife, Teri Black, and is a father of four children.

### *Mr. Black's Selection as President/CEO and Employment Agreement*

15.     Founded more than 40 years ago, CTVN is a broadcast and satellite television network with more than 100 affiliate stations. While CTVN operates within a relatively narrow market segment of television, cable and the internet, it enjoys a widespread audience of Christian followers. CTVN, by its own measure as presented on its website, broadcasts to over six (6) million broadcast television homes every day.

16.     In 2012, CTVN initiated a national search for a new Chief Executive Officer and President to lead the organization. This position is crucial to CTVN's ministry, as this officer

3

operates as the primary strategic leader and serve as its outward-facing figurehead and spokesperson of the organization.

17.     Mr. Black underwent a rigorous interview process that spanned many months as part of and in connection with CTVN's national search.

18.     Ultimately, Mr. Black was selected out of numerous highly qualified candidates by CTVN to be its new CEO and President.  He accepted the job on December 31, 2012, moved his family from Tennessee to Pittsburgh, and began his new role at CTVN.

19.     His employment was governed by an employment agreement (the "Employment Agreement"), an employee handbook and CTVN's amended and restated bylaws (the "Bylaws"). The Employment Agreement was for an initial term of three (3) years and was renewed on January 1, 2016 for another three (3) year term.   A true and correct copy of the operative Employment Agreement is attached and incorporated herein as **Exhibit A**.

20.     Pursuant to the Employment Agreement, Mr. Black's duties and responsibilities included "being the primary intercessor for Cornerstone TeleVision," "exercis[ing] final authority in planning, selection and hiring of all CTVN staff, vendors or any other person or organization to further the mission of the ministry" and, among other things, "develop[ing] the vision and objectives of Cornerstone TeleVision." *See* Ex. A, p. 1.

21.     The Employment Agreement includes a binding arbitration provision for any disputes arising thereunder. *See* Ex. A, pp. 2-3.

22.     The Employment Agreement also addresses termination/cancellation of the Employment Agreement as follows:

4

This Employment Agreement may be terminated **for cause** (**after providing a 60-day written notice**) in the event of any of the following is proven true:

1. Substantial failure to perform the duties after formal board review.
2. Lawful arrest and conviction for any felony crime.
3. Demonstrated violations of biblical morals.
4. Illegal or unethical public conduct that damages the ministry reputation.

*See* Ex. A, p. 3 "Termination/Cancellation" (emphasis added).

23.     At all times, Mr. Black acted in full compliance with the letter, spirit and terms of his Employment Agreement. Unfortunately, CTVN did not.

### *Mr. Black's Dedicated and Successful Service as President/CEO of CTVN*

24.     Mr. Black worked tirelessly as CEO/President of CTVN over his six (6) year tenure as CEO/President. His dedicated service and commitment to CTVN resulted in tremendous national and international impact, growth and innovation for CTVN.

25.     Under Mr. Black's executive leadership, and in unity with the CTVN's Board of Directors and its ministry team:

- the organization became debt-free for the first time since its genesis;

- CTVN's annual expense budget decreased each year following Mr. Black's hire while the quality and quantity of the organization's work increased;

- CTVN created an endowment fund generating future financial assets for its mission and to provide security in turbulent times for donor based organizations;

- CTVN launched national campaigns which involved outreach and discipleship print materials, high-quality digital media and ministry websites;

- the organization designed and implemented a comprehensive employee job description and performance review system;

- a monthly and annual employee recognition program was created and launched;

5

- CTVN's worldwide viewing audience was expanded through the addition of ROKU, Apple, Droid and Google Apps for smart devices;

- national campaigns were launched that allowed millions of people to be touched by CTVN's broadcast of God's word;

- a high-quality digital media ministry community was developed and launched on a new ministry website and on both YouTube and Facebook;

- the organization saw production of the highest quality and largest number of original programs in Christian television;

- CTVN's television viewing audience grew by double digits over the last two years of his leadership as measured by an independent ratings company;

- the organization successfully was able to navigate a three-year process with the FCC to allow significant Federal benefits and reimbursement to be obtained;

- the organization saw production of many outreach/discipleship print materials; and, *inter alia,*

- CTVN's donor development team successfully created a monthly giving program titled "Harvest Partners" to encourage automatic monthly credit card donations.

26.     The growth and successes of CTVN did not stop there under Mr. Black's leadership. Mr. Black, in unity with its Board of Directors and the ministry team:

- developed a successful Christian grassroots movement, *In God We Trust;*

- created a new program and revenue stream with his *Real Life Coaching* program – to which he owns the intellectual property rights – and which includes digital video files, video graphics, recorded coaching sessions, customer lists and related books and materials;

- designed, developed and opened the *Bixler Ministry Center* which gave CTVN the ability to minister to people by phone, email, Facebook and text messaging;

- *"Pittsburgh Faith and Family Channel"* was created and allows nearly 100 churches and ministries to present their Gospel message at no cost; and, *inter alia,*

6

- designed and developed the *Pittsburgh Prayer Team*, which is a Facebook initiative created to unify viewer, donors and local churches to pray in harmony about targeted local issues.

27.     Mr. Black's employment with CTVN prospered and fostered CTVN's ministerial purpose, mission and financial well-being substantially.

28.     At all times, Mr. Black maintained an exemplary employment record during his tenure for CTVN – with not one grievance, disciplinary measure or other adverse action taken against him.

29.     Indeed, Mr. Black's exemplary employment record was affirmed by the CTVN Board who conducted reviews of Mr. Black over each of the years of his employment and who recommended compensation raises – which Mr. Black was awarded, but which he voluntarily refused to accept on a number of occasions throughout his tenure.

30.     From the commencement of Mr. Black's assumption of duties at CTVN in December of 2012, until the abrupt and unlawful termination of Mr. Black's employment by CTVN in November of 2018, Mr. Black enjoyed a pristine employment record, including the complete absence of any warnings, disciplines, suspensions, complaints, write-ups, grievances, charges or negative employment actions of any type.

31.     Mr. Black's dedicated and faithful service and commitment to CTVN allowed CTVN to accomplish growth and financial success that it had never accomplished before.

32.     Not only was Mr. Black instrumental in key growth and success for CTVN, but his wife and daughter also provided many years of invaluable professional services and ministry assistance as employees of CTVN as well.  Unfortunately, CTVN also abruptly terminated their employment without any notice or explanation.

### *The Unscheduled November 6, 2018 CTVN Board Meeting*

33.     On November 6, 2018, Mr. Black was called into an impromptu, unscheduled CTVN Board (hereinafter the "Board") meeting at the CTVN offices.  Board member, Reverend Gary Mitrik ("Reverend Mitrik"), on behalf of the Board and without the full knowledge of the presiding Board Chairman, Mr. Craig Sherwood, proceeded to relay unverified, vague complaints from anonymous members of the staff regarding Mr. Black's alleged "organization leadership style."  The Board made reference to alleged "micromanagement" resulting in "poor morale and/or fear of job loss."

34.     The Board, at no time, relayed any alleged allegations separate and apart from alleged "leadership" or "management style" complaints.  No allegations of any other wrongdoing were ever mentioned or raised at any time by the Board.

35.     Nonetheless, given that purely "leadership style" type complaints were raised, the Board would not further explain the nature of, or elaborate on, these complaints or identify the complainants.

36.     Mr. Black made repeated requests for this information in order to allow himself to respond and rightfully defend himself.  However, the Board refused.

37.     The Board also refused to state why it would not provide Mr. Black with the courtesy of further information surrounding the alleged complaints, particularly given that Mr. Black had an exemplary employment record for CTVN at all times as set forth above. They refused to discuss the charges and allegations under the unfounded and inapplicable excuse of "Whistle Blower protection."

8

38.     Without any ability to understand or properly address the speculative and anonymous complaints raised by the Board, the Board nonetheless asked Mr. Black to take two days off of work to "pray about it."   A follow up meeting would be held the following week.

39.     Mr. Black did just that and prayed extensively – at all times wanting the truth to come to light and be known by all so that a peaceful, amicable and God-focused resolution could be reached.  Those are still his prayers at this time.

### The Solicitation of Negative "Complaints" About Mr. Black Without Investigation

40.     Mr. Black has come to know and believe that in the weeks or months leading up to the November 6, 2018 Board meeting, CTVN's officers, directors and/or managers independently and openly solicited staff complaints or grievances against him while he was out of the country on a CTVN donor trip to Israel in October of 2018.

41.     Upon information and belief, CTVN's Human Resources team, led by CTVN's Human Resources Manager, Deb Goodman, solicited approximately a dozen complaints  – all but four (4) of which are apparently unsigned and anonymous – without any investigation into their truth or validity.  And, as Mr. Black now understands and believes, only negative feedback about Mr. Black was solicited, welcomed or accepted.

42.     Upon information and belief, these purported complaints were misused by certain CTVN directors and managers as pretext to unlawfully terminate Mr. Black's employment "for cause," without the requisite notice or right to cure as provided for by his Employment Agreement.

9

43.    At no time was Mr. Black provided copies of any of the alleged written complaints against him despite his repeated requests to see them and/or be provided further explication about them.

44.    It is also noteworthy that three of the four staff members that actually signed complaints against Mr. Black were thereafter promoted in their duties and roles at CTVN.

### *CTVN'S Continued Damaging Actions Leading to Mr. Black's Wrongful Termination*

45.    Mr. Black left the November 6, 2018 Board meeting feeling as if he had been convicted and sentenced to charges without having the opportunity or knowledge to properly respond and defend himself.

46.    On several different occasions following the November 6, 2018 Board meeting, Mr. Black was denied any opportunity to investigate or confront the allegations against him, let alone conduct or have conducted a prompt and impartial investigation of the claimed allegations. Mr. Black was not allowed to confront, much less cross examine, CTVN or the individuals under its control who made the alleged complaints, let alone have an independent third party do so.

47.    In fact, the day after the unscheduled November 6, 2018 Board meeting wherein Mr. Black was made aware of alleged leadership style complaints, Mr. Black, in an attempt to offer means of resolution and/or remedy, stated that he would agree to work with an independent executive coach or consultant with experience working with CEOs – who could interview those alleged to be impacted by his leadership and help him create a Leadership Development Plan. A true and correct copy of a letter by Mr. Black to the Board dated November 7, 2018 is attached hereto and incorporated herein as **Exhibit B**.

48.    Mr. Black's offer was rebuffed by CTVN without consideration.

49.     Mr. Black also implored the Board to institute a plan to prevent negative fall-out and rumors, locally and nationally, if it was the Board's intent to terminate his employment.  He raised that such a change would impact not only himself, but also his wife and daughter.  He also asked that the CTVN donor and staff family be "informed in a proper manner for the sake of the ministry" and to protect him and his family.  *See* Ex. B.  Unfortunately, Mr. Black's requests were also not given any due consideration.

50.     On November 12, 2018, a follow-up Board meeting with Mr. Black was held. The meeting was not held at the CTVN offices where ample space existed for a meeting.  Rather, it was held off-site, at a hotel, the Residence Inn, in Monroeville, Pennsylvania.

51.     At this November 12, 2019 meeting, Mr. Black was notified that, based on the nebulous complaints related to Mr. Black's alleged leadership or management style, the Board would not be renewing his contract beyond January 2019.  Mr. Black was offered no further explanation or justification for this decision.

52.     CTVN, by and through its actions, did not merely just advise that Mr. Black's contract would not be renewed.  Rather, it wrongfully fired him without notice and without cause, terminating all duties and functions of Mr. Black that very day.

53.     Mr. Black was fired and fired wrongfully, all the while CTVN attempted to portray that he was not being fired, but rather it was simply a matter of not "renewing his contract."

54.     At no point, either before Mr. Black's abrupt and groundless termination, or any time thereafter, was Mr. Black given notice of a basis (whether legal, procedural or otherwise) for his employment termination; nor was Mr. Black provided an opportunity to contest the

11

termination, address CTVN's grounds for termination, if any, or to refute any allegations against his leadership abilities and/or character.

55.     Mr. Black was wrongfully fired on November 12, 2018.  Relieved of all work obligations, all duties, any role at CTVN from that day forward.  His business emails were immediately canceled, his keys and security fobs removed and taken from him.

56.     He was advised at the November 12 off-site meeting that he was no longer permitted on CTVN property.  He was told to leave CTVN's property immediately – then and there.

57.     Mr. Black was not even given the courtesy of being permitted to retrieve his personal property from CTVN that day.  Indeed, it was not for many weeks that CTVN finally allowed Mr. Black to return to the property after hours and under supervision to retrieve his personal belongings which had been boxed and placed in the CTVN warehouse.

58.     Mr. Black's wife[1] and daughter,[2] who were also employed by CTVN, were likewise fired on that same day, without explanation.  Mr. Black was advised that his wife and daughter were "released" from CTVN and Mr. Black was instructed that Mr. Black, his wife, Teri, and daughter, Kelsy, were not to return to the building.

---

[1] Mr. Black's wife, Teri Black, was also employed by CTVN for more than four (4) years and at the time of her termination she was CTVN's Development Manager. Upon Mr. Black's termination, Teri was likewise asked to leave immediately, without any opportunity to retrieve her personal possessions from CTVN's property and without explanation.

[2] Mr. Black's daughter, Kelsy Black was employed by CTVN for more than four (4) years and at the time of her termination she was CTVN's Marketing and Promotions Manager. Upon Mr. Black's termination, Kelsy was likewise asked to leave immediately, without any opportunity to retrieve her personal possessions from CTVN's property and without explanation.

59.     Mr. Black and his family were treated as if they were sentenced and convicted – without an opportunity to have the truth known or defend themselves.

60.     Following the firing of Mr. Black and his family members, the Board eventually moved, by referendum, that Mr. Black's Employment Agreement would not be extended after December 31, 2018.  Again, however, such act was ineffective and merely a guise to try to avoid any claim that Mr. Black's employment was unlawfully terminated on November 12, 2018.

### *Disregard of Corporate Governance and CTVN Procedures*

61.     The Board not only wrongfully fired Mr. Black, but it also disregarded proper corporate governance and proper procedures for removing Mr. Black  as a voting member from the Board.

62.     Pursuant to the Bylaws (Article II, Section 14), a special meeting of the Board to remove a director requires written notice to all Board members at least ten (10) days before the meeting takes place.  A true and correct copy of CTVN's Bylaws are attached hereto and incorporated herein as **Exhibit C**.

63.     Immediately following the November 12, 2018 Board meeting, the Board disabled Mr. Black's CTVN email domain such that he was no longer able to receive Board meeting information and/or notifications.  Therefore, Mr. Black was not in receipt of any notifications of the Board meetings pertaining to his termination/removal from the Board and was denied any meaningful opportunity to vote and/or appear and defend himself.

64.     CTVN also ignored its obligations under the Employment Agreement to provide 60-day written notice and to prove any of the four events warranting termination for "cause" as listed on page three (3) of the Employment Agreement. *See supra.*

13

65.     Specifically, at no time did CTVN offer any facts or proof that: 1) Mr. Black substantially failed to perform his duties after formal board review; 2) Mr. Black was lawfully arrested and convicted for any felony crime; 3) Mr. Black demonstrated violations of biblical morals; or 4) Mr. Black conducted illegal or unethical public conduct that damaged the ministry's reputation. *See* Ex. A, p. 3.

66.     To be clear, Mr. Black performed the duties required of him under the Employment Agreement at all times.  That expressly included that:  he was never arrested or convicted for any felony crime; he at all times demonstrated biblical morals; and he conducted no illegal or unethical public conduct that could damage the ministry reputation.

67.     Nor has CTVN ever alleged or stated that any of the above events have occurred. To the contrary, Mr. Black was a dedicated steward of the CTVN mission since the day that he was hired.

68.     Following the November 12, 2018 Board meeting, and ever-conscientious of protecting his family's reputations, Mr. Black wrote a letter to the Board and respectfully requested that CTVN agree to reach a mutually agreeable statement for public release related to Mr. Black's departure.  A true and correct copy of a letter by Mr. Black to the Board dated November 12, 2018 is attached hereto and incorporated herein as **Exhibit D**.

69.     Again, sadly, Mr. Black's reasonable, justified and good faith requests were not recognized or honored as further demonstrated below.

### *Defamatory and Further Damaging Conduct by CTVN*

70.     Only a day after the referendum vote to remove Mr. Black from CTVN, at a specially convened November 13, 2018 meeting directed by CTVN officers and directors, Mr.

14

Black was disgraced and defamed to more than 50 staff members and employees of CTVN (the "CTVN Staff") – by slanderous inferences and patently false accusations regarding Mr. Black.

71.     Specifically, current CTVN Board Chairman, Reverend Gary Mitrik, read a statement which advised the CTVN Staff that the Board "has decided to move in a different direction and not renew the contract of Donald Black." Reverend Mitrik then added that he "was asked by the Board to apologize to those *hurt, abused, treated harshly*, and for the Board not seeing this and doing something much earlier."

72.     The obvious and only implication of this was that certain individual(s) within the CTVN Staff had been hurt, abused or treated harshly by Mr. Black. This public statement was not only untrue, but carried with it defamatory inferences and spawned harmful speculation by CTVN Staff, viewers and donors regarding Mr. Black.

73.     Within minutes, Reverend Mitrik's message was spread to many others, outside the CTVN Staff and into the broader CTVN viewership and Christian community.

74.     Following the meeting, and much to Mr. Black's utter humiliation and pure dismay, Mr. Black was contacted by several of CTVN Staff who were in attendance at the meeting and inquired as to what had transpired to cause the Board to convey that message.

75.     Mr. Black quickly received many texts and calls from other individuals in the broader CTVN viewership and Christian community who had heard about the Board's message and made the same inquiries of Mr. Black.

76.     Much to Mr. Black's humiliation and dismay, he could not form a proper response because he was lacking information and detail as to what had transpired to cause his termination and regarding the content of the Board's message to CTVN Staff.

15

77.     Upon information and belief, CTVN and its directors, officers and/or agents deliberately made these widely publicized representations to call into question and/or taint Mr. Black's integrity, morality, personal character and 30+ year reputation as a leader in faith-based nonprofit organizations.

78.     CTVN then published the following Board approved press release on its website (the "Press Release"):

> The board of Cornerstone Television Network announces today that its President and CEO, Don Black, *will be leaving the organization to pursue other ministry opportunities*. Don and Teri will no longer be hosting Real Life...

A true and correct copy of the CTVN Press Release is attached hereto and incorporated herein as **Exhibit E** (emphasis added). *See also* http://www.ctvn.org/wp-content/uploads/2018/11/CTVN-Announcement.pdf.

79.     The statement relating to Mr. Black's departure from the organization to pursue "other ministry opportunities" was and is patently untrue.

80.     There was no factual or other basis for CTVN's statement – it was simply false and wholly misleading. Mr. Black never advised that he was leaving CTVN and never advised that he was leaving to pursue another ministry. He intended to do neither and CTVN knew that.

81.     By misstating the true and correct reason that Mr. Black was so abruptly taken off the air, without even the chance to address his viewers one last time, the false statement regarding his departure caused severe and harmful speculation and harm to Mr. Black and his family.

82.     Further, given the context of the defamatory statements made by current Board Chair Reverend Mitrik immediately preceding the Press Release, and considering the insinuation

16

of, or inference from, the defamatory statements was that Mr. Black is unfit, personally or professionally, to serve in CTVN's ministry, or any other ministry (and, indeed, that he had harmed and abused personnel), this statement compounded and only magnified the harm to his reputation, humiliation and shame.

83.     Mr. Black believes that the Press Release, which remains on CTVN's website today, was issued as a guise to conceal the true nature of CTVN's misconduct surrounding Mr. Black's wrongful termination and in order impute ill repute upon him. Their motivation for this statement was an attempt to satisfy any questions from viewers and partners regarding Mr. and Mrs. Black's organizational and broadcast disappearance with a statement meant to preserve the financial donors continued support.

84.     Mr. Black has been denied any meaningful opportunity to clear his name or clear his family's name.

85.     These defamatory statements have disgraced, humiliated and stigmatized Mr. Black and severely damaged and/or compromised his reputation, good moral character and any viable opportunity for meaningful future employment at this time.

86.     As a direct and proximate result of CTVN's wrongful conduct, Mr. Black has sustained injuries and damages including, but not limited to: lost wages and income, past and future; loss of job and career opportunities; loss of earning capacity; humiliation and mortification; loss of reputation and esteem amongst the CTVN Staff and in the broader CTVN viewership and Christian community; damages to personal reputation and damage to business reputation; loss of enjoyment of the ordinary pleasures or everyday life and the loss of the ability to pursue employment of choice.

### *The Dissent to CTVN's Conduct and Treatment of Mr. Black*

87.     In the months to follow, various members of the CTVN Staff, regular and major donors to CTVN and certain Board members, objected to CTVN's actions in wrongfully terminating Mr. Black.

88.     For example, then CTVN Board Chairman, Craig R. Sherwood, motioned the Board to extend Mr. Black's contract and on several occasions implored the Board to allow Mr. Black to properly address the accusations against him and, at the very least, to coordinate with Mr. Black on a mutually-agreeable public statement regarding Mr. Black's departure.  A true and correct copy of Craig R. Sherwood's letter to the Board dated November 19, 2018 is attached hereto and incorporated herein as **Exhibit F**.

89.     Furthermore, one major donor wrote a letter to the Board advising:

> [I was]…taken back by Channel 40's decision to remove Don Black as President.  I liked the direction, the leadership, and the vision that was shared with me.  As a major Donor I would like to privilege to meet with you and the Board to better understand the new direction you speak of, who is now captain of the ship and why Don Black is no longer there.

A true and correct copy of the donor's letter to the Board is attached hereto and incorporated herein as **Exhibit G**.

90.     Upon information and belief, the major donor informed Reverend Mitrik that he retracted his forthcoming six-figure donation to CTVN for 2019 – because he trusted the direction of CTVN under Don's leadership.  *See* Ex G.

91.     It was not until December 2018, that Mr. Black was finally permitted to return to the CTVN premises to retrieve he and his family's personal belongings and, in an inhumane and demeaning fashion.  Unfortunately before being boxed and sent to the warehouse, CTVN

leadership had displayed Mr. Black's personal items on a couch in the executive waiting area for all CTVN Staff and corporate visitors to see.

### *Mr. Black's Intellectual Property and Ownership Rights*

92.     Over the years, Mr. Black has dedicated his life to public ministry and made it his mission to provide innovative solutions to enhance viewership and marketing efforts of CTVN once he became President/CEO.  To that end, Mr. Black developed intellectual property which is nationally recognized as being on the cutting edge of Christian television and interactive training.

93.     In support of this mission, for example, Mr. Black developed digital coaching recordings and written materials for his *Real Life Coaching* program.  His *In God We Trust* grassroots program –which is available on Facebook and email blasts are designed to guide users in their faith and spiritual growth – as well as numerous additional original works in written, audio, and video forms written, created and produced by Mr. Black in the course of his work at CTVN (the "IP Materials").

94.     Acknowledging Mr. Black's substantial creative contributions and exclusive ownership of the resulting works, pursuant to the terms of his Employment Agreement, CTVN expressly agreed that Mr. Black is the owner of "[a]ny work (written or spoken) that [he] originate[s], write[s], or produce[s], during [his] services from CTVN" and he retains "the copyright to the intellectual property, to the work or work product under the terms of this Employment Agreement." *See* Ex. A, p. 4.

95.     Through this provision, CTVN acknowledged, transferred, and/or assigned the ownership of all copyrights and other rights to the IP Materials to Mr. Black and agreed to the ownership of the IP Materials by Mr. Black. *Id.*

96.     Furthermore, pursuant to the terms of his Employment Agreement, Mr. Black retained the rights to his "name, voice and personal likeness." *See* Ex. A, p. 4.

97.     Despite Mr. Black's specific and repeated requests for copies of the IP Materials in CTVN's possession and its recognition of Mr. Black's ownership of the intellectual property rights therein through the Employment Agreement, CTVN refuses to acknowledge Mr. Black's irrefutable ownership interest in the IP Materials, and Mr. Black has been damaged as a result of his inability to use the same.

98.     Instead, CTVN has retained control over the IP Materials, has refused to acknowledge or honor Mr. Black's rights, and has failed to provide access to and refused to return copies of the IP Materials to Mr. Black.

99.     CTVN has, instead, improperly rejected Mr. Black's numerous requests for copies of the IP Materials.

100.    Thus, Mr. Black has been prevented from exercising his rights of ownership – including pursuing valuable, commercial opportunities associated with the IP Materials.

101.    CTVN's refusal to provide the IP Materials to Mr. Black has caused and continues to cause injury to Mr. Black that cannot be compensated solely through an award of monetary relief.

### COUNT I
### Breach of Contract for Failure to Arbitrate

102.    Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

103.    The Employment Agreement in place between Mr. Black and CTVN created a valid and binding contractual obligation that remains enforceable and effective as of this date.

104.    The Employment Agreement contains an arbitration provision which requires CTVN to submit to arbitration in the event a dispute arises under the Employment Agreement. *See* Ex. A, p. 3.

105.    Mr. Black initiated a private arbitration proceeding against CTVN by properly filing a demand with the American Arbitration Association (the "Demand"). A true and correct copy of the Demand is attached and incorporated herein as **Exhibit H**.

106.    CTVN breached the Employment Agreement by refusing to submit to arbitration.

107.    Specifically, CTVN refused to pay for the administrative fee required of a respondent in AAA arbitration proceedings, thereby preventing Mr. Black from bringing his wrongful termination and other claims against CTVN in a private, confidential arbitration setting as he desired. Thus, leaving Mr. Black with no choice but to proceed with litigation in this public forum given that the AAA closed his case due to CTVN's failure to pay the arbitration fee. A true and correct copy of the letter from the AAA is attached and incorporated herein as **Exhibit I**.

108.    Furthermore, even *after* CTVN wrongly refused to participate in the contractually required private arbitration, Mr. Black sent further communication to CTVN, through counsel, imploring that the parties engage in Christian Conciliation – outside of court – to resolve their disputes. He had previously pleaded for Christian Conciliation on several different occasions *before* filing with the AAA – in accordance with scripture – to resolve the parties' disputes.

21

However, at each step and despite each plea, CTVN refused Christian Conciliation and, more recently, ignored Mr. Black's request altogether.

109.    Specifically, one week prior to commencing this lawsuit, Mr. Black, through counsel, provided CTVN with a draft of this complaint and again urged that the parties engage in Christian Conciliation in accordance with scripture – further advising that Mr. Black would have no choice but to file this lawsuit if CTVN refused.  CTVN never gain Mr. Black the courtesy of a response to this request.  Hence, despite every effort by Mr. Black to avoid a public dispute, CTVN left Mr. Black no choice.

110.    As a direct and proximate result of CTVN's past and continuing breach of the arbitration provision of the Employment Agreement, Mr. Black has been damaged:  this includes, but is not limited to, the fees and costs paid by Mr. Black to initiate the AAA arbitration proceeding against CTVN.

WHEREFORE, Mr. Black requests a judgment in his favor and against CTVN and an award of the fees and costs associated with Mr. Black's initiation of the AAA arbitration proceeding and CTVN's wrongful refusal to participate therein as required by the Employment Agreement, and such other relief as the Court deems just and proper.

## COUNT II
### Breach of Contract for Wrongful Termination

111.    Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

112.    The Employment Agreement in place between Mr. Black and CTVN created a valid and binding contractual obligation that remains effective and enforceable.  *See* Ex. A.

113.    The Employment Agreement contains a provision which requires CTVN to provide 60-days' written notice prior to termination and prove of one the four events listed on page three (3) of the Employment Agreement before it could terminate Mr. Black for "cause." *See* Ex. A, p. 3.

114.    CTVN breached the Employment Agreement by failing to provide 1) 60-days' written notice of termination and 2) proof that Mr. Black: a) substantially failed to perform his duties after formal board review, b) was lawfully arrested and convicted for any felony crime, c) demonstrated violations of biblical morals, or d) conducted illegal or unethical public conduct that damaged the ministry reputation. *See* Ex. A, p. 3.

115.    Pursuant to the Employment Agreement, Mr. Black's term was not to expire until January 6, 2019.

116.    Mr. Black's employment was wrongfully terminated, without the 60-days' written notice/right to cure to which he was entitled, prior to the expiration of his Employment Agreement – on November 12, 2018.

117.    CTVN's wrongful firing of Mr. Black was in breach of the Employment Agreement.

118.    As a direct and proximate result of CTVN's past and continuing breach of the Employment Agreement, Mr. Black has sustained injuries and damages including, but not limited to:  lost wages and income, past and future; loss of job and career opportunities; loss of earning capacity; humiliation and mortification; loss of reputation and esteem amongst the CTVN Staff and in the broader CTVN viewership and national Christian community; damages to

23

personal reputation and damage to business reputation; loss of enjoyment of the ordinary pleasures or everyday life; and the loss of the ability to pursue employment of choice.

WHEREFORE, Mr. Black requests a judgment in his favor and against CTVN and an award of all available actual, direct, consequential, and compensatory damages, and such other relief as the Court deems just and proper.

## COUNT III
### Declaratory Judgment Under the Copyright Act, 17 U.S.C. § 204 and 28 U.S.C. § 2201

119.    Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

120.    Pursuant to the express terms of the Employment Agreement, Mr. Black is the indisputable owner of the IP Materials.

121.    The Employment Agreement contains a valid and enforceable acknowledgement of Mr. Black's undivided rights in all such IP Materials.

122.    Nonetheless, CTVN contests Mr. Black's rights and has retained control over the IP Materials.

123.    CTVN has failed to provide access to and refused to return the IP Materials to Mr. Black despite his various requests.

124.    CTVN has also rejected and refused to acknowledge Mr. Black's ownership rights of the IP Materials.

125.    CTVN's conduct in refusing to return Mr. Black's IP Materials and rejecting that Mr. Black has ownership over them is in violation of the Employment Agreement and in violation of the Copyright Act, 17 U.S.C. § 204, thereby entitling Mr. Black to a declaratory

judgment of his ownership of the IP Materials under the Declaratory Judgment Act, 28 U.S.C. § 2201.

126.   By its refusal to provide the IP Materials to Mr. Black, and its denial of Mr. Black's rights therein, CTVN has caused an immediate case or controversy concerning the ownership of the IP Materials under the Employment Agreement and otherwise.

127.   CTVN's refusal to provide the IP Materials to Mr. Black has caused and continues to cause injury to Mr. Black that cannot be compensated solely through an award of monetary relief.

WHEREFORE, Mr. Black requests a judgment in its favor and against CTVN (a) entering a declaration that Mr. Black is the owner of all tangible and intangible rights in and to the IP Materials, including all electronic manuscript files, (b) issuing an injunction commanding the immediate transfer and release of all such IP Materials, including all electronic manuscript and design files, (c) all available actual, direct, consequential, and compensatory damages, and (d) awarding such other preliminary and permanent injunctive relief, available attorneys' fees and costs, and such other relief as the Court deems just and proper.

### COUNT IV
### Breach of Contract Related to Mr. Black's Intellectual Property

128.   Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

129.   The Employment Agreement in place between Mr. Black and CTVN created a valid and binding contractual obligation. *See* Ex. A.

130.    Pursuant to the terms of his Employment Agreement with CTVN, Mr. Black is the owner of "[a]ny work (written or spoken) that [he] originate[s], write[s], or produce[s], during [his] services from CTVN" and he retains "the copyright to the intellectual property, to the work or work product under the terms of this Employment Agreement." *See* Ex. A, p. 4.

131.    Furthermore, Mr. Black retained the rights to his "name, voice and personal likeness." *See* Ex. A, p. 4.

132.    CTVN has breached the contract by refusing to acknowledge Mr. Black's irrefutable ownership interest in the IP Materials and Mr. Black has been damaged as a result of its inability to use the same.

133.    Mr. Black's IP Materials include, but are not limited to, the following: (a) books/booklets/workbooks, (b) DVD/CD's, (c) broadcast programs, (d) real life coaching internet-based discipleship training, (e) student/customer files and records that are attached to a Real Life Coaching contact in CTVN's database, (f) In God We Trust Facebook fan page and email addresses, (g) Pittsburgh Prayer Team, Facebook fan page, and email addresses, and (h) any other recorded programs, social media placements, and internet content.

134.    CTVN has improperly retained and/or declared control over the IP Materials, and/or has failed to provide access/refused to return the IP Materials to Mr. Black, and thereby prevents Mr. Black from exercising his rights of ownership – including pursuing valuable, commercial opportunities associated with the IP Materials.

135.    CTVN's refusal to provide the IP Materials to Mr. Black and/or declaration of control over the IP Materials has caused and continues to cause injury to Mr. Black that cannot be compensated solely through an award of monetary relief.

136.    CTVN's has also improperly refused to allow any use of the IP Materials by Mr. Black in the commercial market – such refusal being without any good faith or justifiable basis.

WHEREFORE, Mr. Black requests a judgment in its favor and against CTVN (a) entering a declaration that Mr. Black is the owner of all tangible and intangible rights in and to the IP Materials, including all electronic manuscript files, (b) issuing an injunction commanding the immediate transfer and release of all such IP Materials, including all electronic manuscript files, (c) all available actual, direct, consequential, and compensatory damages, and (d) awarding such other preliminary and permanent injunctive relief, available attorneys' fees and costs, and such other relief as the Court deems just and proper.

## COUNT V
### Conversion

137.    Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

138.    CTVN's actions in diverting and misappropriating all copies of the IP Materials, without limitation as alleged herein, constitutes the tort of conversion.

139.    Mr. Black is the indisputable owner of the IP Material under the Employment Agreement and is legally entitled to the use and enjoyment thereof.

140.    CTVN has interfered with Mr. Black's property and possessory interests in copies of the IP Materials, and such interference was unjustified, without permission or privilege, and is continued by CTVN's wrongful disposition of Mr. Black's property rights.

141.    CTVN's actions as alleged herein constitute interference with Mr. Black's right of property in the physical and electronic materials misappropriated by CTVN.

142.     As a result of CTVN's acts of conversion, Mr. Black has suffered and is suffering damages and is entitled to an award of actual, direct, consequential, and compensatory damages, preliminary and permanent injunctive relief, and such other relief as the Court deems just and proper.

143.     Moreover, CTVN has acted intentionally, willfully, maliciously, outrageously, and with reckless indifference to the rights of Mr. Black in the course of its acts of conversion as alleged herein, warranting an award of punitive damages.

144.     CTVN's refusal to provide the IP Materials to Mr. Black has caused and continues to cause injury to Mr. Black that cannot be compensated solely through an award of monetary relief.

WHEREFORE, Mr. Black requests a judgment in its favor and against CTVN (a) entering a declaration that Mr. Black is the owner of all tangible and intangible rights in and to the IP Materials, including all electronic manuscript files, (b) issuing an injunction commanding the immediate transfer and release of all such IP Materials, including all electronic manuscript files, (c) all available actual, direct, consequential, and compensatory damages, and (d) awarding such other preliminary and permanent injunctive relief, available attorneys' fees and costs, and such other relief as the Court deems just and proper.

### COUNT VI
### Defamation, 42 Pa. Cons. Stat. 44 8341, *et seq.*

145.     Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

28

146.   The statements made by Board Member Reverend Mitrik, on behalf of CTVN and its Board related to alleged abusive and harsh treatment of CTVN Staff by Mr. Black, as set forth above, are defamatory in nature as they have diminished Mr. Black's reputation – both commercially and personally – and have injured Mr. Black's business and profession, by, *inter alia*, casting doubt on Mr. Black's temperament, character, integrity and faith.

147.   CTVN published these statements at a November 13, 2018 Board meeting to more than 50 staff members and employees of CTVN, as set forth above.

148.   CTVN then published the Press Release relating to Mr. Black's alleged intent to "pursue other ministry opportunities" on its website for the world to see. *See* Ex. E. *See also* http://www.ctvn.org/wp-content/uploads/2018/11/CTVN-Announcement.pdf.

149.   Upon information and belief, the Press Release, which remains on CTVN's website today, was issued as a guise to conceal the true nature of CTVN's misconduct surrounding Mr. Black's wrongful termination and in order impute ill repute upon Mr. Black and preserve its donor base.

150.   Given the context of the defamatory statements made by Board Member Reverend Mitrik immediately preceding the Press Release, and considering the insinuation of, or inference from, the defamatory statements was that Mr. Black is unfit, personally or professionally, to serve in CTVN's ministry, or any other ministry, this statement was likewise harmful to his reputation and caused him humiliation and shame.

151.   Both statements are patently untrue, misleading and highly offensive to a reasonable person.

29

152.    CTVN's statements are directly applicable to Mr. Black, as they name him directly.

153.    Any recipient of CTVN's statements would understand the defamatory meaning of those statements and would understand that these statements are to be applied to Mr. Black.

154.    Mr. Black has suffered special harm as a result of the publication of these statements, including, but not limited to, a diminished reputation amongst the CTVN Staff and in the broader CTVN viewership and/or the national Christian community.

155.    There is no conditionally privileged occasion which exists to allow CTVN to have made the defamatory statements.

156.    CTVN and its agents knew, or reasonably should have known, of the falsity of each of the statements at the time those statements were made and acted with actual malice.

157.    CTVN's conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on the part of CTVN.

158.    CTVN and its agents had an appreciation for, and consciously disregarded, the risk of harm to Mr. Black.

159.    As a direct and proximate result of CTVN's defamatory statements, Mr. Black has sustained injuries and damages including, but not limited to: lost wages and income, past and future; loss of job and career opportunities; loss of earning capacity; humiliation and mortification; loss of reputation and esteem in the CTVN community and the broader national Christian communities; damages to personal reputation and damage to business reputation; loss of enjoyment of the ordinary pleasures or everyday life; and the loss of the ability to pursue employment of choice.

WHEREFORE, Mr. Black requests a judgment in his favor and against CTVN and an award of all available actual, direct, consequential, and compensatory damages, available attorneys' fees and costs, punitive damages, and such other relief as the Court deems just and proper.

## COUNT VII
### Slander

160.    Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

161.    The spoken words of Board Member Reverend Mitrik, on behalf of CTVN and its Board at the November 13, 2018 meeting, impute disrepute and abusive and dangerous propensities, among other negative attributes, upon Mr. Black.

162.    As set forth above, those words darkened Mr. Black's then-existing reputation for being a man of compassion, faith and integrity among the Christian television community and beyond.

163.    CTVN's statements are particularly harmful to an individual in Mr. Black's profession, considering these statements have made their way around the extended Christian nonprofit community.   Now, because CTVN's statements have caused confusion and Mr. Black's ill repute, other Christian television networks which would have considered engaging Mr. Black are disinclined to employ him.

164.    Board Member Reverend Mitrik's statements, on behalf of the Board, are patently untrue, misleading and highly offensive to a reasonable person.

31

165.   CTVN's statements are directly applicable to Mr. Black, as they name him directly.

166.   Mr. Black has been harmed by the publication of CTVN's spoken words.

167.   CTVN and its agents knew, or reasonably should have known, of the falsity of each the statements at the time those statements were made and acted with actual malice.

168.   CTVN's conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on the part of CTVN.  CTVN and its agents had an appreciation for, and consciously disregarded, the risk of harm to Mr. Black.

169.   As a direct and proximate result of CTVN's slanderous statements, Mr. Black has sustained injuries and damages including, but not limited to: lost wages and income, past and future; loss of job and career opportunities; loss of earning capacity; humiliation and mortification; loss of reputation and esteem in the CTVN community and the broader Christian communities; damages to personal reputation and damage to business reputation; loss of enjoyment of the ordinary pleasures or everyday life; and the loss of the ability to pursue employment of choice.

WHEREFORE, Mr. Black requests a judgment in his favor and against CTVN and an award of all available actual, direct, consequential, and compensatory damages, available attorneys' fees and costs, punitive damages, and such other relief as the Court deems just and proper.

## COUNT VIII
### False Light

170.    Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

171.    The statements of Reverend Mitrik, on behalf of CTVN and its Board at the November 13, 2018 meeting, as well as the statements made in the Press Release, impute disrepute and abusive and dangerous propensities, among other negative attributes, upon Mr. Black.

172.    As set forth above, these statements darkened Mr. Black's then-existing reputation for being a man of compassion, faith and integrity among the Christian television community and beyond.

173.    CTVN's statements are particularly harmful to an individual in Mr. Black's profession, considering these statements have made their way around the extended Christian television community. Now, to the extent CTVN's statements caused confusion and Mr. Black's ill repute, other Christian television networks would have employed Mr. Black are disinclined to employ him.

174.    Both statements are patently untrue, misleading and highly offensive to a reasonable person.

175.    CTVN's statements are directly applicable to Mr. Black, as they name him directly.

176.    Mr. Black has been harmed by the publication of CTVN's statements.

33

177.    CTVN and its agents knew, or reasonably should have known, of the falsity of each the statements at the time those statements were made and acted with actual malice.

178.    CTVN's conduct, as described above, is outrageous, and demonstrates intentionally willful, wanton, and reckless behavior on the part of CTVN.  CTVN and its agents had an appreciation for, and consciously disregarded, the risk of harm to Mr. Black.

179.    As a direct and proximate result of the statements made by Board Member Reverend Mitrik at the November 13, 2018 meeting and through the Press Release, Mr. Black has sustained injuries and damages including, but not limited to:  lost wages and income, past and future; loss of job and career opportunities; loss of earning capacity; humiliation and mortification; loss of reputation and esteem in the CTVN community and the broader Christian communities; damages to personal reputation and damage to business reputation; loss of enjoyment of the ordinary pleasures or everyday life; and the loss of the ability to pursue employment of choice.

WHEREFORE, Mr. Black requests a judgment in his favor and against CTVN and an award of all available actual, direct, consequential, and compensatory damages, available attorneys' fees and costs, punitive damages, and such other relief as the Court deems just and proper.

### COUNT IX
### Violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq*.

180.    Mr. Black incorporates by reference, as if fully set forth here, the allegations of all preceding and subsequent paragraphs.

34

181.    The Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.* (the "WPCL"), provides that Pennsylvania employers must pay the final compensation of separated employees in full and prohibits employers from wrongfully withholding severance payments from an employee when terminated by employer.

182.    Included in the definition of final compensation are fringe benefits such separation pay or unpaid vacation or sick leave and wage supplements or any other pay guaranteed by the employer. 43 P.S. § 260.2a. The WPCL defines the term "employer" broadly, encompassing in its definition every person, firm, partnership, association, corporation, receiver or other officer of a court and any agent or officer. 43 P.S. § 260.2a.

183.    The WPCL further provides for the recovery of an employee's costs and attorneys' fees in remedying violations of the same. 43 P.S. § 260.9a(f).

184.    Pursuant to the WPCL, the payments that CTVN owes but has failed to pay to Mr. Black constitute compensation, this includes, but is not limited to, three weeks of unused vacation days, 2 unused personal days, 29 days of accrued sick leave.

185.    Mr. Black has fulfilled his obligations and any conditions precedent to receiving the payments and CTVN has violated the WPCL by failing and refusing to pay the foregoing payments owed to Mr. Black.

WHEREFORE, Mr. Black requests a judgment in his favor and against CTVN and an award of all available actual, direct, consequential, and compensatory damages, available attorneys' fees and costs, in addition to damages and prejudgment and post judgment interest awardable under the WPCL, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donald O. Black requests judgment in his favor and against Defendant CTVN and asks this Court to order and/or enter judgment, *inter alia*:

a. awarding Mr. Black his actual, direct, consequential and compensatory damages, including, without limitation, lost wages, lost benefits and damage to personal and business reputation;

b. awarding Mr. Black punitive damages, available attorneys' fees and costs, including any fees or costs associated with filing a demand with the American Arbitration Association;

c. entering a declaration that Mr. Black is the owner of all rights in and to and/or associated with the IP Materials;

d. issuing preliminary and permanent injunctions commanding the immediate transfer and release of all such IP Materials, including hard copies and all electronic manuscript and design files, along with passwords and associated digital names and contact information, to Mr. Black;

e. awarding available prejudgment and post judgment interest; and

f. awarding available attorney's fees and costs, and all other and further relief to Mr. Black that this Court deems just and proper.

## JURY DEMAND

A trial by jury is hereby demanded on all claims and issues so triable.

Respectfully submitted,

CLARK HILL PLC

Dated:  September 24, 2019                By:  /s/ *Lauren D. Rushak*
                                          Lauren D. Rushak, Esq.
                                          PA I.D. No. 83728
                                          lrushak@clarkhill.com
                                          Lindsay S. Fouse, Esq.
                                          PA I.D. No. 320590
                                          lfouse@clarkhill.com
                                          One Oxford Centre
                                          301 Grant Street, 14th Floor
                                          Pittsburgh, PA  15219-1425
                                          (412) 394-7711

                                          *Counsel for Plaintiff*

## **VERIFICATION**

I, Donald O. Black, do verify that the averments of fact made in the within Verified Complaint are true and correct to the best of my personal knowledge, or information and belief.

I understand that any false statements within my knowledge contained herein are made subject to penalty under 28 U.S.C. § 1746, relating to unsworn declarations.

Date: September 24 , 2019